UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RYAN S. BROWN | CIVIL ACTION |
| VERSUS | NO: |
| ADVOCATES FOR ACADEMIC EXCELLENCE IN EDUCATION, INC, D/B/A BENJAMIN FRANKLIN HIGH SCHOOL AND PATRICK WIDHALM | JURY DEMAND |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff herein is Ryan S. Brown, a person of the full age of majority and a domiciliary of Orleans Parish, who respectfully represent as follows:

**DEFENDANTS**

1. Made defendants herein are:

    a. Advocates for Academic Excellence in Education, Inc., d/b/a Benjamin Franklin High School, a Type 3 Charter member of the Orleans Parish School Board; and,

    b. Patrick Widhalm, who is the Principal of Ben Franklin and responsible for the hiring and termination decisions of its teaching personnel. Defendant Widhalm acted under color of state law and is sued in his official capacity.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. §§1331 and §1343 as Plaintiff's claims arise under 42 U.S.C.A. §§ 1983 and 1988 and the First and Fourteenth Amendment to the Constitution of the United States.

3. Pursuant to 28 U.S.C.A. §1367, this Court also has jurisdiction over the state law claims asserted herein, which are part of the same case or controversy.

4. The Court has personal jurisdiction over Defendants.

5. This Court is the proper venue because the incidents giving rise to this litigation occurred in Orleans Parish.

## BACKGROUND

6. Ryan Brown graduated from Benjamin Franklin High School (hereinafter "Ben Franklin") in 2001.

7. He subsequently attended LSU and majored in Finance from 2001 until Hurricane Katrina struck south Louisiana in August 2005.

8. Thereafter, he transferred to Tulane and switched his major to Graphic Design.

9. Mr. Brown graduated with a Bachelor of Arts from Tulane in 2009, with honors.

10. Mr. Brown has maintained a longtime interest in basketball.

11. While at Tulane and in the years afterward, Mr. Brown volunteered as a basketball coach at various schools, including Ben Franklin.

12. Additionally, Mr. Brown coached AAU basketball from 2010 through 2014.

13. While coaching his AAU teams, Mr. Brown personally underwrote more than $3,000 per year for underprivileged students who played on his teams.

14. He was hired as a basketball and volleyball coach at Ben Franklin in 2014 and served in that capacity until May 2017.

15. In 2015, Mr. Brown was also hired by Ben Franklin as a full-time substitute.

16. Mr. Brown never joined the teacher's union at Ben Franklin and never paid any dues to such organization.

17. As a full-time substitute, Mr. Brown was generally responsible for administering lesson plans left by the absent teacher.

18. Occasionally, due to an unexpected absence, he would be left to improvise in a class when the regular teacher had failed to leave any guidance or lesson plans for the class.

19. On May 4, 2017, Mr. Brown was substituting for the teacher of the United States History Advanced Placement (AP) class.

20. The teacher was unexpectedly absent and had not left a lesson plan.

21. The AP exam was scheduled for the following day and all but four of the students in the class were taking the exam.

22. Mr. Brown allowed the students to use the class to prepare for their exam the next day.

23. Mr. Brown sat at the front of the class with four students who were not taking the AP exam.

24. These students were all juniors and three of the four were African-American males.

25. Mr. Brown had coached two of the students on the Ben Franklin basketball team.

26. A third student (hereinafter "Student A") was a football player and had regularly served as the play-by-play announcer during the lunchtime basketball games organized by Mr. Brown.

27. These games were part of Franklin Intramural Basketball Association ("FIBA"), which was sponsored by Mr. Brown.

28. All four of the students had participated in the FIBA program for the last two years.

29. Accordingly, Mr. Brown was well-acquainted with all four of the students.

30. At the time, one of the students was watching highlights from an NBA playoff game and the group was discussing basketball.

31. The conversation turned to the football career of one of the students in the small group, Student A.

32. Student A indicated that he was not going to play football his Senior year.

33. When asked why, Student A explained that he was worried that another player would cause him to reinjure his knee.

34. In response, Mr. Brown relayed an anecdote from a conversation that he had recently had with a well-known prep basketball player, who was also African-American (hereinafter "Prep Star").

35. In that conversation, Mr. Brown asked the Prep Star why he chose to shoot three-pointers instead of driving into the lane more often.

36. The Prep Star responded by saying: "I ain't going to let these niggas tear up my knees."

37. Mr. Brown relayed that exact quote to the four students.

38. Student A responded by telling Mr. Brown that he could not say that word.

39. When Mr. Brown asked what word, Student A responded with "nigga."

40. When Mr. Brown asked why not, Student A responded because he was white.

41. Mr. Brown indicated that he did not believe that language worked like that and said he thought it was racist to suggest that he was unable to use a word because of his race.

42. Up until this point in the conversation, Student A did not indicate that he was upset with Mr. Brown.

43. Mr. Brown then asked Student A if there were other words that he was prohibited from using.

44. Student A suggested the "F word".

45. Mr. Brown asked him what the "F word" was and Student A responded that homosexuals don't like it when the "F word" is said.

46. Student A also suggested Mr. Brown was not permitted to use the "K word" to refer to Jews.

47. Mr. Brown then attempted to engage the student in an understanding of how the word "nigga" had been commoditized by its regular usage in slang and rap music.

48. At that point in time, another student in class began to video the interaction between Mr. Brown and Student A.

49. The conversation that followed is transcribed by the following:

STUDENT: Nigga is racist as shit

Class: {Laughter}

STUDENT: How can you be so little minded you can't understand that nigga is racist for a white man to say to a black man. That's fucking racist. [Student name] would you say nigga?, would you ever say nigga?, No. [Student name] would never say nigga. Would yall? Would yall white people say nigga? Fuck no they wouldn't say nigga. How they..

TEACHER: Do you know what a commoditized word is?

STUDENT: You explain it. Explain it to me. Explain it to me.

TEACHER: It's a word that's been used so many times that it doesn't have its original meaning…

STUDENT: It's used by black people

TEACHER: It's used by everyone

STUDENT: No, you use it, I don't, no, don't say everyone

TEACHER: The word has become commoditized so that anyone can use it..

STUDENT: NO, no

TEACHER: …and it's not in a negative connotation

STUDENT: NOOO, it's a negative-ass connotation

TEACHER: No it's not

STUDENT: It's a negative-ass connotation. For you to say it to me is negative as fuck

TEACHER: Ok, when you hear it in a bunch of songs, are those people …

STUDENT: By black men.

TEACHER: being negative when they say it? No its just

STUDENT: By black men.

TEACHER: a word!

STUDENT: By black men, by black men.

TEACHER: What does the word mean when they use it?

STUDENT: My friend, my black friend

TEACHER: It means friend

STUDENT: Eminem, who is a fucking rapper said he'll never say the word as long as it's offensive.

TEACHER: Ok, so, if you say a word, it means friend. If I say a word, the same word, it means something different?

STUDENT: Yes, you're not black

TEACHER: That's not true.

STUDENT: Yes, the fuck it is.

TEACHER: It's not.

STUDENT: Yes it is.

TEACHER: Not if you want the world to move on.

STUDENT: What the, FUCK THIS WORLD!

TEACHER: If you want it to be the way it was fifty years ago, then you're true, you're right

STUDENT: The world is moving on because nigga, white people aren't saying nigga. If a white man says nigga, shits not moving on, you said niggas in slavery. Nigger I'm a Nigger. I'm a fucking nigger

TEACHER: No, you are not.

STUDENT: Because you put me in slavery.

TEACHER: No you are not.

TEACHER: Nobody uses that word

STUDENT: Yes they do.

TEACHER: Nobody says Nigger.

STUDENT: YOU JUST FUCKING SAID IT!

Class: {Laughter}

TEACHER: You're acting like we're having a conversation and you can say the word, but I can't

STUDENT: You can't say nigger or fucking nigga.

TEACHER: No, calling somebody that is disrespectful.

STUDENT: [inaudible] don't say that shit.

TEACHER: I'm not calling you anything.

STUDENT: I don't give a fuck, you said it.

TEACHER: No one is calling anyone.

STUDENT: You said it, you said it, you said it.

TEACHER: Dude, if we're in a class and I'm teaching you {holds up hands to the board}, hey, the word nigger is an old word.

STUDENT: Fuckin god dammit, stop fuckin sayin it {student slams desk on ground}

TEACHER: It's a word bruh, you cannot go through life acting like a word …

STUDENT: Stop fucking saying it

TEACHER: .. can affect you

STUDENT: Not saying nigger and nigga, point blank fuck you period.

TEACHER: You keep saying it

STUDENT: I can say it

TEACHER: I said it one time…

STUDENT: You missed the conversation…

TEACHER: ..and you're blowing this whole conversation completely out of proportion

STUDENT: ..we had a whole assembly after school ,

TEACHER: we were talking about basketball

STUDENT: we had an assembly after school

TEACHER: You said it 25 times

STUDENT: I can say it, I'm black, I can say whatever…

50. A subsequent portion of the conversation was not recorded, but the student subsequently told Mr. Brown that he was going to be so much better than him (*i.e.*, a substitute teacher)

51. Mr. Brown responded that if he felt that way, then he wanted Student A to do better.

52. The other students were paying attention to the interaction between Mr. Brown and their classmate, and a review of the video indicates that the class was more bemused than upset about the conversation.

53. The tenor of the conversation was not charged until the very end when Student A stood up and began to slam his desk on the floor before he left the room.

54. After confirming that the remainder of class was occupied, Mr. Brown left to find Student A who was visibly upset at that time.

55. When he could not immediately find Student A, he reported the matter to the Principal's office where Student A appeared not long after.

56. After getting a basic description of the incident, which occurred around 9:30 a.m. on a Thursday morning, Mr. Widhalm, the principal, advised Mr. Brown to go back to work.

57. Approximately two hours later, as Mr. Brown was preparing to officiate the FIBA championship game, he was approached by an assistant principal and the CFO and Mr. Brown was escorted from campus.

58. Over the course of the following few days, including the weekend, Ben Franklin administrators, on information and belief, interviewed the students who were in the class room at the time of the incident.

59. A five-page report was prepared and signed by Mr. Widhalm on May 8, 2017—the Monday following the incident.

60. In the interim, the incident was reported in both print and broadcast media under headlines like "Teacher suspended over racial slur."

61. As referenced in the conversation with Student A, the use of racially-offensive language had been the subject of prior discussion in the school during the year.

62. Mr. Brown was not aware that there had been a prior assembly wherein usage of such language had been discussed.

63. On the night of the incident, somebody created an online petition that suggested that Mr. Brown was the third teacher who had used the "N" word during that school year at Ben Franklin.

64. Hundreds of alumni signed the petition in that first night, with many of them raising concerns that Ben Franklin had not previously disciplined its teachers for using the "N" word.

65. In the wake of the incident on May 5, 2017, students at the school staged a sit-in in the school's office, which turned into an impromptu hour-long assembly.

66. The matter received substantial attention on social media wherein many alumni and community members were critical of Ben Franklin and its handling of racial matters.

67. On the evening of May 8, 2017, Ben Franklin issued the following press release:

> The administration of Benjamin Franklin High School has concluded its investigation of a classroom incident on Thursday, May 4, 2017 involving a full-time substitute teacher, who has been suspended since the incident. The investigation determined that the persistent assertion of the teacher's own views about a highly-charged term overcame his professional responsibilities, and this decision to start and to escalate the interaction resulted in neglect of his duty to create an environment for students that is stable. Furthermore, it did not represent high quality teaching and

learning, as outlined in the school's Collective Bargaining Agreement. The employee has resigned pending administrative action effective 3:30 p.m. on Monday, May 8, 2017. Although this investigation was aided by a video capturing a few minutes of the exchange between the substitute teacher and students, interviews with the substitute teacher, the students in the intimate exchange, and students in the classroom provided necessary context and corroboration.

68. At the time that Ben Franklin had issued its press release, the matter had escalated in both traditional and social media to the point that Mr. Brown was being accused of being racist.

69. Ben Franklin selectively omitted critical facts and conclusions regarding its investigation from its press release.

70. Specifically, Defendant Widhalm's written report of the investigation included the following paragraphs:

> There is no evidence that Mr. Brown expressed racist slurs toward any student, or that he is a racist, but rather that he chose to start and to escalate this conversation around a highly-charged term. Mr. Brown let his own feelings, even about first amendment rights, overtake the classroom setting, creating an imbalance that inappropriately, even if unintentionally, offended. Furthermore, this violated a condition of the Collective Bargaining Agreement, that the needs and aspirations of the students are at the center of all decisions driving high quality teaching and learning " (Article III Academic Freedom). Furthermore, by allowing, and even participating in a visibly volatile and unsafe classroom environment, and by leaving students unattended after the incident reached a boiling point, Mr. Brown demonstrated neglect of duties or students, failure to perform, unprofessional conduct, or an action, omission or condition that interferes with the performance of duties at a standard acceptable to the Employer." (Article XI Just Cause)
>
> Therefore, it is my decision that Mr. Brown's employment at Benjamin Franklin High School is terminated effective immediately.

71. Notwithstanding Mr. Widhalm's decision to terminate Mr. Brown, the press release suggested that he had resigned.

12

72. More troubling was the failure of the press release to reveal that Ben Franklin's own investigation had determined that the incident was not the result of racial animus.

73. The failure of Ben Franklin to include this information about a subject that had already received substantial negative media attention was made with actual malice.

74. But for Mr. Brown's termination, which resulted from this incident, Mr. Brown would have been hired as a full-time teacher at Ben Franklin next year.

75. Ben Franklin's decision to terminate Mr. Brown's employment resulted from the pressure exerted by its students, alumni, and the community that was based on incomplete information and the professed reasons for his termination were only a pre-text for the abridgement of Mr. Brown's First-Amendment right to free speech.

76. The actions of the school served to reinforce conclusions that Mr. Brown's actions were improperly motivated.

77. As a result of the press release, further coverage on traditional and social media generated impressions that Mr. Brown had acted with racial animus.

78. Rather than acting with racial animus, Mr. Brown's efforts were plainly motivated in providing high-quality teaching and learning to his students in a safe environment concerning the impact of a "highly-charged term" in a safe environment.

## CLAIMS AND CAUSES OF ACTION

**A.    Violation of 42 U.S.C.A. §1983 - Denial of Due Process**

79. Plaintiff realleges and incorporates by reference all of the preceding paragraphs as if each were fully stated herein.

80. Mr. Brown engaged in constitutionally-protected expression and was dismissed in response to his exercise of constitutional rights. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).

81. The First and Fourteenth Amendments extend to high school campuses. *Keefe v. Geanakos*, 418 F.2d 359, 360-61 (1st Cir. 1969).

82. Academic freedom is a "special concern of the First Amendment." *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967).

83. Mr. Brown's exercise of academic freedom is itself an issue of public concern protected by the First Amendment. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Silva v. University of New Hampshire*, 888 F. Supp. 293, 315 (D. N.H. 1994).

84. Mr. Brown's speech involved a matter of public concern insofar as matters of race were of significant public concern at that time, particularly in light of the City of New Orleans's decision to remove monuments to the lost cause of the Confederacy from its public spaces.

85. Mr. Brown's attempt to educate Student A outweighed Ben Franklin's interest in forbidding the use of racist language by its faculty. *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671 (6th Cir. 2001).

86. "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).

87. The government may not prohibit the expression of an idea simply because it is considered offensive or disagreeable, *Texas v. Johnson,* 491 U.S. 397, 414 (1989), and the First Amendment "leaves no room for the operation of a dual standard

in the academic community with respect to the content of speech." *Papish v. Board of Curator of the Univ. of Missouri*, 410 U.S. 667, 671 (1973).

88. The Supreme Court has long recognized that "words are often chosen as much for their emotive as cognitive force," and that "we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Cohen v. California*, 403 U.S. 15, 26 (1971).

89. The First Amendment forbids the government from censoring speech based on "personal predilections," and "the State has no right to cleanse the public debate to the point where it is grammatically palatable to the most squeamish among us." *Id.* at 21, 25.

90. Defendants' purported reason for terminating Mr. Brown's employment—that he "demonstrated neglect of duties or students, failure to perform, unprofessional conduct, or an action, omission or condition that interferes with the performance of duties at a standard acceptable to the Employer" – because "he chose to start and to escalate this conversation around a highly-charged term" demonstrates that Mr. Brown was terminated because of his use of a highly-charged term.

91. Defendants' decision to terminate Mr. Brown's employment was also a response to ameliorate the public outcry that had resulted from Mr. Brown's use of a "highly-charged term" in light of the use of such term in prior incidents at Ben Franklin during the 2016-2017 school year.

92. Defendants have violated the constitutional rights of Plaintiff by acting under color of state law to deprive Mr. Brown of rights and privileges secured by the

Constitution and laws of the United States and the Constitution and laws of the State of Louisiana, giving rise to Plaintiff's claims for relief under 42 U.S.C.A. §1983.

93. Defendants' denial of Mr. Brown's free speech rights has caused substantial injury to his constitutionally-protected property and/or liberty interests and damage to his reputation.

94. Defendants' deprivation and denial of Mr. Brown's constitutionally-protected liberty and property interests give rise to Plaintiff's claim for relief under 42 U.S.C.A. §1983.

95. As a result of the denial of his constitutional right to free speech, Plaintiff has suffered, among other losses, injury to his professional reputation, mental anguish, pain and suffering, embarrassment, humiliation, and emotional distress for which he is entitled to damages in an amount to be proven at trial.

**B.  Defamation**

96. Plaintiff re-alleges and incorporates by reference all previous allegations as if copied in their entirety herein.

97. All of the foregoing evidences a stunning disregard for the truth and indicate that Ben Franklin acted with actual malice when issuing its report and subsequent comments to the press.

98. Defendants' made such statements were misleading, false and communicated with malice.

99. Accordingly, Defendants are liable to Mr. Brown for the damages resulting from its defamatory actions.

C.   **Injunctive Relief**

100.   Plaintiff realleges and incorporates by reference all of the preceding paragraphs as if each were fully stated herein.

101.   As a direct and proximate result of the actions of Defendants, Mr. Brown has lost the opportunity to teach as a full-time teacher at Ben Franklin, which had been promised to him for the 2017-2018 school year.

102.   As a result, Plaintiff has lost the opportunities and career benefits previously afforded him by such employment.

103.   Because his job has been wrongfully terminated due to the lawful exercise of his constitutional right to free speech, Plaintiff has suffered both pecuniary and non-pecuniary losses for which he is entitled to relief, including actual, compensatory, consequential, incidental and/or nominal damages.

104.   Accordingly, Plaintiff is entitled to a permanent injunctive relief ordering Defendants to: (a) rescind its termination of Plaintiff's job; (b) restore his position as it was before the incident occurred in May 2017; and (c) refrain from any further harassing, retaliatory and unlawful conduct toward Plaintiff.

105.   By its conduct described in this Complaint, Defendants acted knowingly, willfully, and maliciously and/or with reckless disregard for Plaintiffs' constitutionally-protected rights, thus entitling Plaintiff to an award of punitive damages, in addition to all other relief sought herein.

## JURY DEMAND

106.   Plaintiff demands a trial by jury of all issues triable to a jury.

## RELIEF SOUGHT

107. In violating Mr. Brown's interest and rights, Defendants, while acting under color of state law, have deprived Plaintiff of his due process rights secured by the U.S. Constitution in violation of 42 U.S.C.A. §1983, et al. and breached their obligations to Plaintiff to provide him with a right to free speech.

108. Accordingly, Plaintiff seeks the following relief and remedies:

    a.    that Defendants rescind its termination of Plaintiff's job;

    b.    that Defendants restore his position as it was before the incident occurred in May 2017;

    c.    that Defendants refrain from any further harassing, retaliatory and unlawful conduct toward Plaintiff.

    d.    that Defendants compensate his Plaintiff for all losses, including but not limited to, lost income and/or benefits that he has sustained as a result of the unlawful actions of Defendant;

    e.    that Defendants compensate Plaintiff for all damages, including, but not limited to, damages for Plaintiff's mental anguish, emotional distress, pain and suffering, humiliation, embarrassment, and injury to reputation;

    f.    that Defendant's compensate Plaintiff for punitive damages;

    g.    that Defendant's compensate Plaintiff for his reasonable attorney's fees and costs incurred by Plaintiff in bringing this action pursuant to 42 U.S.C. §1988.;

    h.    legal interest from the date of judicial demand; and

    i.    all other general and equitable relief to which Plaintiff may be entitled.

WHEREFORE, Plaintiff, Ryan Brown, prays that Defendants, Ben Franklin and Patrick Widhalm, be served with this Complaint and that after due proceedings,

Plaintiff be awarded the relief prayed for above, as well as any and all other relief to which he is justly entitled.

>Respectfully submitted,
>
>*/s/ Michael S. Fawer*
>Michael S. Fawer, No. 5485, T.A.
>312 30th St.
>New Orleans, Louisiana 70124
>504-483-8600 – Tel.
>504-483-5100 – Fax.
>msfawer@aol.com
>
>**ATTORNEY FOR RYAN BROWN**