UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RYAN S. BROWN | CIVIL ACTION |
| v. | NO. 17-5754 |
| ADVOCATES FOR ACADEMIC EXCELLENCE IN EDUCATION, INC., d/b/a BENJAMIN FRANKLIN HIGH SCHOOL AND PATRICK WIDHALM | SECTION: "N" - KDE - MBN |

## **ORDER AND REASONS**

Presently before the Court is Defendants' "Rule 12(b)(6) Motion to Dismiss" (Rec. Doc. 5). Defendants' motion is asserted in response to the First Amendment freedom of speech and Louisiana defamation claims that Plaintiff Ryan S. Brown ("Plaintiff") has asserted herein against Defendants Advocates for Academic Excellence in Education, Inc. d/b/a/ Benjamin Franklin High School ("Ben Franklin") and Principal Patrick Widhalm. Having carefully reviewed the parties' submissions, the record in this matter, and applicable law, the Court finds Plaintiff's First Amendment claims lack merit for essentially the reasons set forth in Defendants' memoranda. Accordingly, for the reasons stated herein, **IT IS ORDERED** that the motion is **GRANTED** such that Plaintiff's federal law claims are **DISMISSED WITH PREJUDICE** and Plaintiff's state law defamation claim is **DISMISSED WITHOUT PREJUDICE**.

As detailed in Plaintiff's complaint and the parties' opposing memoranda, Plaintiff's claims arise from his allegedly involuntary termination, in May 2017, from employment as a full-time substitute teacher at Ben Franklin. In short, Plaintiff contends that he was fired from his

1

employment, in violation of his First Amendment right to free speech, because of remarks he made to a student ("Student A") regarding the propriety of his using words that Student A considered to be racist when spoken by persons of a differing race.

In evaluating Plaintiff's claims, the Court first notes that Plaintiff's comments were made during the course of a "free period" authorized by Plaintiff, as the substitute teacher, when the absent Advanced Placement ("AP") American History teacher had not left a lesson plan, and all but four of the students wanted to study for a test scheduled to be taken the next day. Eventually, a conversation ensued amongst Plaintiff and the four non-studying students, who were sitting near Plaintiff at the front of the classroom. At first focused on sports and amateur athletes' efforts to avoid injury, the discussion ultimately yielded the comments for which Plaintiff contends the First Amendment insulates public employees from adverse employment actions.

On this topic, the Fifth Circuit has explained:

> Public employees do not surrender all their free speech rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern. *See, e.g. Pickering v. Bd. of Educ.,* [391 U.S. 563, 568 (1968)]; *Connick v. Myers*, [461 U.S. 138, 147 (1983)]; *United States v. Nat'l Treasury Employees Union,* [513 U.S. 454, 466 (1995)]. At the same time, "[t]his prospect of [First Amendment] protection . . . does not invest them with a right to perform their jobs however they see fit." *Garcetti v. Ceballos,* [547 U.S. 410, 418 (2006)]. The relationship between the speaker's expressions and employment is a balancing test. A public employee's speech is protected by the First Amendment when the interests of the worker "as a citizen in commenting upon matters of public concern" outweigh the interests of the state "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568[.]

*Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 691–92 (5th Cir. 2007). Thus, "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's

2

operations." *Garcetti*, 547 U.S. at 418. In other words,"[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* at 418.[1]

In determining whether a public employee's statements enjoy the protections of the First Amendment, the Court first considers whether the statements constitute "speech on a matter of *public* concern." *Connick,* 461 U.S. at 146 (emphasis added). Matters of public concern are those that can fairly be characterized as "relating to any matter of political, social, or other concern to the community," considering the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. This query is necessary because "absent the most unusual circumstances, a federal court is not the proper forum in which to review the wisdom of a personnel decision" regarding an employee's statement upon topics "only of *personal* interest." *Id.* at 147 (emphasis added). The Court also must evaluate the role of the speaker, that is, whether he or she spoke as a "*private* citizen," rather than a *public* employee making a statement pursuant to his or her official duties. *Garcetti,* 547 U.S. at 418-23. In the latter scenario, "employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

If these two threshold queries yield affirmative responses, such that a plaintiff is found to have acted as a private citizen speaking on matters of public concern, the "possibility of a First Amendment claim arises," and the *Pickering* balancing test referenced above is undertaken.

---

[1] Given the basis of its ruling, the Court does not find it necessary to determine whether a private right of action may be maintained against one or more of the defendants under 42 U.S.C. § 1983 notwithstanding Ben Franklin's nonprofit status. *See* LSA-R.S. 17:3991 ("charter school . . . shall be organized as a nonprofit corporation under applicable state and federal laws.")

3

*Id*. at 418. Hence, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employees to operate efficiently and effectively."*Id*. at 419. "The 'rights' of the [speaker, however, are] always tempered by a consideration of the rights of the audience and the public purpose serviced, or disserved, by his speech." *Martin v. Parrish,* 805 F.2d 583, 585 (5th Cir. 1986). Thus, for example, when it is students that are the audience, consideration is given to whether the educational setting is post-secondary, rather than at the high school (or lower) level, and whether the statements at issue are directed to a "captive audience." *Id.* at 584-86.

Here, the Court assumes, for purposes of this motion, that Plaintiff's remarks are properly construed as having been made by a private citizen speaking on matters of public concern. Even so, the Court is compelled to conclude that, given the specific facts involved, Plaintiff's interests in speaking as he did are substantially outweighed by Defendants' interests in furthering efficient, orderly, and effective school operations by terminating Plaintiff's employment.

As an initial matter, the Court notes that Plaintiff's comments were *not* shared with Student A outside of the school hours in a non-academic setting from which the student was free to leave, or simply ignore Plaintiff's remarks, without risking adverse consequences. Rather, Plaintiff's comments were made during the course of a regularly scheduled class period and inside a classroom (subject to Plaintiff's authority and control) where Student A was required to be. Furthermore, despite that academic setting, Plaintiff's comments were *not* made, for instance, as part of a communications, debate, or speech course expressly or tacitly approved by the school administration. They likewise were not the byproduct of a history lesson devoted to topics that reasonably could be expected to bring about a (properly respectful and sensitive) discussion about

4

the evolution of race relations in the United States.[2] To the contrary, the verbal exchange in question, debating the propriety of Plaintiff's use of the "n word" during the course of an extraneous conversation, was the result of an unsolicited and gratuitous comment made *by Plaintiff,* not one of the students, in recounting an anecdote to Student A (and the other students within hearing distance) about a previous remark allegedly made by a well-known prep athlete.[3]

---

[2] *See* May 8, 2017 Investigation Report ("Report") (Rec. Doc. 5-2). The report, along with a May 9, 2017 press release and the video referenced herein, are cited to and quoted by Plaintiff's complaint such that the Court may consider these documents in evaluating the Rule 12(b)(6) motion at issue. *See* Complaint (Rec. Doc. 1); *see also, e.g., Randall D. Wolcott, M.D., P.A. v. Sebelius,* 637 F.3d 757, 763 (5th Cir. 2011). Pertinent here, page five of the report quotes the first paragraph of Article III, entitled "Academic Freedom," of the Collective Bargaining Agreement as follows:

> Our classrooms are places where the needs and aspiration of the students are at the center of all decisions driving high quality teaching and learning. It is the intent of the parties to assure that students benefit from academic freedom in the classroom. Academic freedom shall mean that teachers are free to present instructional materials which are pertinent to the subject and level taught, with the outlines of appropriate course content and within the planned instructional program as determined by normal instructional and/or administrative procedures and as finally approved by the administration of the school. Academic freedom shall also mean that a teacher shall have freedom of discussion with in the classroom on matters which are relevant to the subject matter under study and within their area of professional competence, assuming that all facts concerning controversial issues shall be presented in a scholarly and objective manner, and assuming that all discussion and presentation shall be maintained with the outlines of appropriate course content, be pedagogically justifiable, and be subject to standards of good taste.

*See* Report (Rec. Doc. 5-2), at p. 3 of 5.

[3] See Report (Rec. Doc. 5-2), at p. 3 of 5 ("Mr. Brown . . . chose to start and escalate this conversation around a highly charged term.)

Importantly, moreover, Plaintiff, as a full-time substitute teacher, was the very person entrusted by the school administration to provide a calm, controlled, and secure learning environment for the students in that class. When it became apparent (to anyone in the room or watching the video) that Student A was becoming increasingly upset and agitated by Plaintiff's remarks, however, Plaintiff failed to maintain classroom order and proper decorum. Nor did Plaintiff act as necessary to diffuse the increasingly tense situation. Even worse, Plaintiff actually escalated matters by persisting in his efforts – in the presence of the entire class – to convince Student A of the validity of Plaintiff's position, and the concomitant fallacy of Student A's differing opinion.[4] Indeed, the heated conversation did not end until "the incident reached a boiling point,"[5] and Student A, slamming down his desk, stormed out of the classroom.[6] Plaintiff soon followed, leaving the rest of the class unattended.

Furthermore, the terminus of Plaintiff's commentary brought about by Student "A"'s departure from the classroom was not sufficient to conclude the matter and restore calm. Instead,

---

[4] A portion of the conversation at issue was videoed by one of the students using a cellular phone and was submitted into the record, as a manual attachment, on a compact disc. *See* Rec. Doc. 5-3 (compact disc). A transcript also was prepared and is quoted in the parties' submissions. *See* Complaint (Rec. Doc. 1) at ¶ 49; Report (Rec. Doc. 25-1) at p. 9 of 22; and Opposition Memorandum ( Rec. Doc. 7.), p. 5 of 30 - p. 9 of 30. Student A's continuing objections to Plaintiff's remarks and escalating disconcertment are readily apparent to anyone viewing or even listening to the exchange. *See also* Report (Rec. Doc. 5-2), at p. 3 of 5.

[5] *See* Report (Rec. Doc. 5-2), at p. 3 of 5.

[6] This fact is characterized as "neglect of duties or students, failure to perform, unprofessional conduct, or an action, omission or condition that interferes with the performance of duties at a standard acceptable to the Employer" in the May 8, 2017 Investigation Report. *See* Report (Rec. Doc. 5-2), at p. 2 of 5 - p. 3 of 5. Of course, nothing herein shall be construed as the Court's acceptance, as reasonable, of a student's unilateral, unauthorized, and abrupt departure from class, and use of vulgar and disrespectful language toward a teacher, even under circumstances such as presented here, on a claim of merely being offended.

the student video[7] taken of a portion of the interchange between Plaintiff and Student A was subject to widespread and repeated publication on the internet and numerous complaints by students, parents, and alumni were made. The event also necessitated an impromptu school assembly to address the matter,[8] several student and parent interviews conducted as part of the administration's investigation,[9] and a press release.[10]

Given the foregoing, even when all factual disputes are construed in Plaintiff's favor, as the Court must do at this stage of the proceeding,[11] the Court finds Plaintiff's federal claims properly dismissed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim for which the protections of the First Amendment to the United States Constitution provide relief.[12] In so concluding, the Court by no means suggests that appropriate classroom instruction must be devoid of any statement that a particular student, parent, teacher, or administrator might find offensive, or that a publicly employed teacher is lawfully subjected to

---

[7] The Court is unaware whether Ben Franklin's school policy allowed student possession and/or use of cellular devices in classrooms or elsewhere on campus. In any event, nothing herein shall be construed as tacit approval of a policy allowing possession and use of personal cellular phones and recording devices by students in class.

[8] *See* Complaint (Rec. Doc. 1) at ¶65.

[9] *See* Report (Rec. Doc. 5-2); Press Release (Rec. Doc. 5-4).

[10] *See* Press Release (Rec. Doc. 5-4); *see also* Complaint (Rec. Doc. 1) at ¶65.

[11] The parties' submissions regarding the motion presently before the Court reveal the existence of a possible factual dispute with respect to whether Plaintiff was involuntarily terminated from employment, voluntarily resigned, or resigned in lieu of being terminated, the dispute, in this instance, is immaterial. Regardless of the proper characterization of the discontinuation of Plaintiff's employment at Ben Franklin, the result here is the same.

[12] Although not determinative of the issue before the Court, Defendants' submission identifies Plaintiff's status while employed at Ben Franklin as "probationary" employee, *i.e.* one employed for less than two years and subject to discipline up to and including termination at the sole discretion of the employer. *See* Report (Rec. Doc. 5-2).

adverse employment action any time a student is upset or offended by something a teacher says. Indeed, such is the nature of a true academic environment.

On the other hand, high school teachers undisputedly do not have the unfettered right to speak to their students on topics and under circumstances reasonably prohibited by school policy.[13] And certainly, teachers at the high school level can reasonably be required to conduct themselves in a professional manner, and terminated upon allowing his or her own "feelings . . . overtake the classroom setting, creating an imbalance that inappropriately, even if unintentionally, offended" and "participating in a visibly volatile and unsafe classroom environment."[14] Accordingly, on the instant set of facts, it cannot be reasonably disputed that Plaintiff's federal constitutional claims concerning the cessation of his employment at Ben Franklin lack legal merit.[15]

Turning now to Plaintiff's remaining defamation claim, given the dismissal of Plaintiff's federal law claims at the pleading stage of this proceeding, the Court declines to exercise the supplemental jurisdiction permitted by 28 U.S.C. §1367 over the state law claim. *See* 28 U.S.C. §2367(c)(3); *see also, e.g., Watson v. City of Allen, Texas,* 821 F.3d 634, 642 (5th Cir. 2016) (federal court generally should decline to exercise jurisdiction over state law claims when all federal law claims are eliminated before trial); *Brookshire Bros. Holding v. Dayco Prod.*, Inc., 554 F.3d 595,

---

[13] *See "*Academic Freedom," "Probationary Status," and "Just Cause" Excerpts from Collective Bargaining Agreement set forth in Report (Rec. Doc. 5-2), at p. 3 of 5.

[14] *See* Report (Rec. Doc. 5-2), at p. 3 of 5; *Id.* ("For the purpose of a public response, the following characterization will be used: *The investigation concluded that the persistent assertion of the teacher's own views about a highly-charged term overcame his professional responsibilities, and that his decision to start and to escalate the interaction resulted in neglect of his duty to create an environment for students that is stable and that represents high quality teaching and learning, as outlined in the school's collective Bargaining Agreement.*").

[15] Allegedly unbeknownst to Plaintiff, a school assembly was held earlier in the school year in which the use of "racially offensive language" had been discussed. *See* Complaint ( Rec. Doc. 1), at ¶¶ 61-62.

602 (5th Cir. 2009)(same).  Accordingly, that claim is dismissed without prejudice to any right that Plaintiff may have to assert it in Louisiana state court.

New Orleans, Louisiana, this 29th day of March 2018.

_____
**KURT D. ENGELHARDT**
**United States District Judge**